Filed 6/30/21  Vega v. YapStone, Inc. CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| PAULA VEGA et al.,<br><br>    Plaintiffs and Appellants,<br><br>v.<br><br>YAPSTONE, INC.,<br><br>    Defendant and Respondent. | A160884<br><br>(Contra Costa County<br>Super. Ct. No. MSC18-01535) |

Paula Vega appeals from a summary judgment entered in favor of her former employer in an action under the California Fair Employment and Housing Act.  She contends the trial court erred in failing to find there were disputed issues of fact regarding her claim of associational disability discrimination and related claims.  We affirm.

## BACKGROUND

YapStone, Inc. is a payment services company located in Walnut Creek, California.  YapStone hired Marcela Vega as an accounting associate in December 2014.  Paula Vega, Marcela's older sister, was hired in February 2015, to work in the company's call center and subsequently moved to the

1

position of on-line risk fraud analyst.[1]  According to their declarations, the sisters lived together and Paula had raised Marcela "like a mother."

Marcela was granted a leave of absence beginning August 31, 2016, to travel to Colombia, the sisters' country of origin, for a second opinion on treatment for carpal tunnel syndrome and epicondylitis.  A doctor detected a hernia during a physical examination, and Marcela underwent surgery on October 18, 2016, then developed sepsis and pancreatitis and was placed in the intensive care unit.  When she began to experience post-surgical complications, Paula advised her manager at YapStone that she might need to go to Colombia and he told her "not to worry, that family came first."

On October 26, Paula sent text messages to two "superiors" saying she needed to go to Colombia to take care of Marcela and anticipated returning in a week.  On November 7, she emailed that she had changed her return flight to November 14, and expected to return to work on November 15, " 'if all goes well.' "  Paula was using paid time off benefits during this period.

Marcela did not recover as well as anticipated and on November 14, Paula emailed her employer again, saying Marcela remained in the hospital and Paula would return to California on November 20, and to work on November 21, " 'if all goes well.' "  Paula said she had a letter she could provide to human resources stating that Marcela was still in the hospital.

On November 17, Paula received an email from YapStone Human Resources Specialist Ina Jezildzic, who thanked Paula for "looping us in on your expected return date" and said Paula's manager had approved her time out of the office as paid and unpaid time off through November 21, 2016.

---

[1] We refer to plaintiffs by their first names for convenience and clarity, as they share the same surname.

Jezildzic advised that she did not think Paula qualified for the Family Medical Leave Act (FMLA).

Paula responded by email that she would not be able to return to work as expected on November 21, 2016, because Marcela was still in the hospital and Paula "needed to help her 'until further notice.' " Paula attached a November 11, 2016 letter from Marcela's doctor stating Marcela was in the intensive care unit, and asked why Jezildzic felt Paula did not qualify for FMLA leave.

On November 21, 2016, Jezildzic emailed Marcela, acknowledging the November 11 doctor's note Paula had provided, and asking for an updated doctor's note and expected return date so the company would "know if we are able to grant an additional extension of your leave." On the same date, Jezildzic emailed Paula a letter that "officially" informed her, " 'given the current business needs, your manager is only able to extend your time off through November 25, 2016.' " The letter stated that Paula was expected to return to work on Monday, November 28, and if she did not return by that date, "we will consider this a resignation of your employment from YapStone. You will be eligible to reapply for your position or any open position within YapStone whenever you are able to return, however, we cannot guarantee a position will be available." It additionally stated, in response to Paula's question about FMLA leave, that care of a sister was not a qualified reason for such leave, and listed the reasons for which FMLA and/or California Family Rights Act (CFRA) leave could be taken.[2]

[2] The qualifying reasons listed in the letter were to care for "an immediate family member (employee's spouse, registered domestic partner, child, registered domestic partner's child or parent) with a serious health condition," for the employee's own "serious health condition that makes the

Paula spoke with Jezildzic by telephone on November 23, 2016, then emailed to confirm " 'I am NOT resigning from my job.' " Paula told Jezildzic she loved her job, had to take an unplanned leave "because my sister was dying," felt it was unfair the company was "making me choose between my job and my loved one," and "by forcing me to return by the following Monday the company was choosing to fire me." Regarding YapStone's stated need to fill her position, Paula said, " 'As I mentioned over the phone, in order for the team to replace me, you would have to interview, hire and then train someone to replace me, which training by the way can be 2 or more weeks. That can probably take longer to do than for me to get back to work once I know my sister is stable and I can be sure it is OK for me to return to the US.' " Paula reiterated, " 'I AM NOT 'RESIGNING' " and said, " 'I might not make it back to work" by November 28, 2016, " 'I hope we can work something out' " and " 'I am not trying to stay here longer than I need to.' " Paula stated, "I want to make sure my sister is stable and in good condition for me to return to the US and then I would love to continue to work with YAPSTONE but if that is not possible, that is YAPSTONE's choice not mine." Oddly, the email ends, "Thank you for your time and have a great day! resigning [¶] Paula Vega."

On the morning of November 28, 2016, Paula emailed Jezildzic to provide another doctor's note regarding Marcela's status. The note said Marcela was "in recovery from multiple surgical procedures for sepsis and pancreatitis" and " 'temporary incapacity for sixty (60) days from 18 October 2016.' "

---

employee unable to perform his or her job" and in connection with pregnancy, birth of a child, or placement of a child with the employee for adoption or foster care.

4

At the end of the workday on November 28, Paula received an email and letter from Jezildzic stating, "as of close of business on November 28, your manager nor HR have not received any communication from you in regards to your status to return to work. Your failure to return to work is an indication of job abandonment. We are notifying you that your employment with the company is terminated effective November 28th, 2016." The letter explained, "we have attempted to accommodate your continual requests for time off to be with an ill family member by providing you unpaid time off even though you do not qualify for FMLA or CFRA. At this point in time, your continued requests to extend your time off from work is [*sic*] hindering the ability to perform our business. We acknowledge and empathize with you on the ill health of your family member, however, as stated in our previous communication, we are unable to extend your time off any further."

An email from Jezildzic to other YapStone employees involved in drafting and reviewing Paula's termination letter, sent at 5:12 p.m. on November 28, 2016, stated, "Paula did send an email over today but it was on behalf of Marcella Vega and not referencing herself or intent to return. . . . The last communication Paula sent to us regarding her absence was on the 23rd . . . ."

The following day, November 29, Jezildzic emailed Paula that she had received the doctor's note Paula sent on November 28, and asked if Paula would be speaking on behalf of Marcela going forward.

Paula never requested to work remotely during her leave. She testified at her deposition that there were a total of five people, including herself, working as fraud analysts. Asked whether her team was adequately staffed or overworked when she worked there, Paula testified that they were overworked.

5

YapStone solicited applications to replace Paula, interviewed candidates and extended an offer to one on December 9, 2016. The candidate accepted and began work on December 19, 2016.

Meanwhile, Jezildzic emailed Marcela on December 7, 2016, that pursuant to the doctor's note Paula had provided on November 28, Marcela was expected to return to work by December 19, 2016, and that her FMLA leave would expire on January 9, 2017.

YapStone approved Marcela's leave of absence for the entire time she was in Colombia, first as an unpaid personal leave, then under the FMLA beginning on October 18, 2016, then as a reasonable accommodation.

Paula and Marcela returned to California on January 13, 2017. Marcela remained on leave until YapStone terminated her employment on March 14, 2017. Paula testified at her deposition that she did not apply for a job with YapStone when she returned from Colombia because she felt "the company was unfair to fire me and fire my sister because you couldn't accommodate to doctors' orders and I would not want to work for a company that treats its employees that way."

Marcela and Paula filed the complaint in this action on July 31, 2018, alleging two causes of action on behalf of Marcela and four on behalf of Paula, either singly or jointly with Marcela. This appeal is concerned only with the latter four: Wrongful termination in violation of public policy (third cause of action), failure to engage in good faith in the interactive process under the California Fair Employment and Housing Act (FEHA) (Gov. Code, § 12940, subd. (n))[3] (fourth cause of action), failure to take all steps necessary to prevent discrimination under FEHA (§ 12940, subd. (k)) (fifth cause of action)

_____

[3] Further statutory references will be to the Government Code except as otherwise specified.

6

and associational disability discrimination under FEHA (§ 12926, subd. (o)) (sixth cause of action).

YapStone moved for summary judgment or summary adjudication of Paula's claims, arguing she never requested a reasonable accommodation and the termination of her employment was due to her indefinite absence, not her association with her sister. The trial court issued a lengthy tentative ruling granting the motion for summary judgment. Neither party requested a hearing, and the tentative ruling became the court's order. YapStone served notice of entry of judgment, and Paula appealed.

## DISCUSSION

"A defendant moving for summary judgment must show 'that one or more elements of the cause of action . . . cannot be established, or that there is a complete defense to that cause of action.' (Code Civ. Proc., § 437c, subd. (p)(2).)" (*Castro-Ramirez v. Dependable Highway Express, Inc.* (2016) 2 Cal.App.5th 1028, 1035–1036 (*Castro-Ramirez*).) We review an order granting summary judgment de novo, viewing the evidence " 'in a light favorable to plaintiff as the losing party [citation], liberally construing [his or] her evidentiary submission while strictly scrutinizing defendants' own showing, and resolving any evidentiary doubts or ambiguities in plaintiff's favor.' (*Saelzler v. Advanced Group 400* (2001) 25 Cal.4th 763, 768.)" (*Id.* at pp. 1035–1036.) "We accept as true both the facts shown by the losing party's evidence and reasonable inferences from that evidence. (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 856; *Sada v. Robert F. Kennedy Medical Center* (1997) 56 Cal.App.4th 138.)" (*Id.* at p. 1036.) "Summary judgment is appropriate only when 'all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' (Code Civ. Proc., § 437c, subd. (c).) A triable

issue of material fact exists if the evidence and inferences therefrom would allow a reasonable juror to find the underlying fact in favor of the party opposing summary judgment. (*Aguilar*[, at p.] 850.)" (*Ibid*.)

## I.

Paula's primary claim against YapStone is for associational disability discrimination. FEHA makes it unlawful for an employer, unless based upon a "bona fide occupational qualification," to discharge or otherwise discriminate against a person because of specified characteristics, including "physical disability." (§ 12940, subd. (a).) The specified characteristics expressly "include[] a perception that the person has any of those characteristics or that the person is associated with a person who has, or is perceived to have, any of those characteristics." (§ 12926, subd. (o).) "Accordingly, when FEHA forbids discrimination based on a disability, it also forbids discrimination based on a person's association with another who has a disability." (*Castro-Ramirez, supra,* 2 Cal.App.5th at p. 1036.)

"California has adopted the three-stage burden-shifting test for discrimination claims set forth in *McDonnell Douglas Corp. v. Green* (1973) 411 U.S. 792." (*Sandell v Taylor-Listug, Inc.* (2010) 188 Cal.App.4th 297, 307 (*Sandell*); *Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 354–356 (*Guz*).) Briefly stated, at trial, the plaintiff has the initial burden to establish a prima facie case of discrimination; if the plaintiff does so, "a presumption of discrimination arises" and the burden shifts to the employer to rebut the presumption with evidence that its action was taken for a legitimate, nondiscriminatory reason; if the employer sustains this burden, the presumption of discrimination disappears and the plaintiff may attempt to show the employer's proffered reasons were pretextual or offer other evidence of discriminatory motive. (*Guz,* at p. 356.) "This so-called *McDonnell*

*Douglas* test reflects the principle that direct evidence of intentional discrimination is rare, and that such claims must usually be proved circumstantially. Thus, by successive steps of increasingly narrow focus, the test allows discrimination to be inferred from facts that create a reasonable likelihood of bias and are not satisfactorily explained." (*Guz,* at p. 354.)[4]

[4] Paula maintains the *McDonnell-Douglas* test is unnecessary in the present case because there is direct evidence she was fired because of her association with her disabled sister. " '[T]he *McDonnell Douglas* test is inapplicable where the plaintiff presents direct evidence of discrimination.' " (*Trop v. Sony Pictures Entertainment, Inc.* (2005) 129 Cal.App.4th 1133, 1144, quoting *Trans World Airlines, Inc. v. Thurston* (1985) 469 U.S. 111, 121.)

What Paula sees as direct evidence is the combination of YapStone's acknowledgments that it terminated her because she did not return to work by the deadline it gave her and that it was aware she could not return because of her association with her disabled sister. This, Paula maintains, is just like the situation in cases holding that where an employee's absences from work are caused by a disability, termination of employment due to excessive absence is termination due to the disability. (*Humphrey v. Memorial Hospitals Assn.* (9th Cir. 2001) 239 F.3d 1128, 1139–1140; *Teahan v. Metro-North Commuter R. Co.* (2d Cir. 1991) 951 F.2d 511; *Kimbro v. Atlantic Richfield Co.* (9th Cir. 1989) 889 F.2d 869, 875.)

YapStone's termination of Paula's employment when she did not return to work, even with awareness that her absence was due to her caring for Marcela, does not amount to direct evidence of *discrimination.* Direct evidence is evidence which proves a fact without inference or presumption. (*Trop v. Sony Pictures Entertainment, Inc., supra,* 129 Cal.App.4th at p. 1145.) YapStone's awareness of the reason for Paula's absence does not necessarily mean YapStone fired Paula because of some sort of hostility toward Marcela's disability and, therefore, Paula's connection to it. YapStone maintains it terminated Paula because her absence—regardless of the reason for it—was interfering with its ability to perform its business operations. Linking Paula's termination to discrimination based on her association with her disabled sister requires an inference that YapStone's awareness reflects discriminatory intent. The cases Paula relies upon support the conclusion that an employer cannot evade liability by delinking a disability from conduct

9

A prima facie case of disability discrimination under FEHA requires a showing that (1) the plaintiff suffered from a disability, (2) the plaintiff was otherwise qualified to do his or her job, with or without reasonable accommodation, and (3) the plaintiff was subjected to adverse employment action because of the disability. (*Green v. State of California* (2007) 42 Cal.4th 254, 262 (*Green*); see *Nealy v. City of Santa Monica* (2015) 234 Cal.App.4th 359, 378–379; *Jensen v. Wells Fargo Bank* (2000) 85 Cal.App.4th 245, 255 (*Jensen*).) Adapting this framework to the associational discrimination context, the 'disability' from which the plaintiff suffers is his or her association with a disabled person. Respecting the third element, the disability must be a substantial factor motivating the employer's adverse employment action. (Cal. Code Regs., tit. 2, § 11009, subd. (c); *Harris v. City of Santa Monica* (2013) 56 Cal.4th 203, 229, 232; *Rope v. Auto-Chlor System of Washington, Inc.* (2013) 220 Cal.App.4th 635, 658 (*Rope*).)

When, as here, a defendant employer's motion for summary judgment " 'relies in whole or in part on a showing of nondiscriminatory reasons for the discharge, the employer satisfies its burden as moving party if it presents evidence of such nondiscriminatory reasons that would permit a trier of fact to find, more likely than not, that they were the basis for the termination. [Citations.] To defeat the motion, the employee then must adduce or point to evidence raising a triable issue, that would permit a trier of fact to find by a preponderance that intentional discrimination occurred. [Citations.]' " (*Dinslage v. City and County of San Francisco* (2016) 5 Cal.App.5th 368, 378–

---

caused by the disability, not that an employer's awareness that conduct is caused by a disability is direct evidence of discrimination.

379, quoting *Kelly v. Stamps.com Inc.* (2005) 135 Cal.App.4th 1088, 1097–1098.)[5]

Published California cases discussing associational disability discrimination are rare, as the only two we are aware of noted. (*Castro-Ramirez, supra,* 2 Cal.App.5th at p. 1036 ["seldom-litigated cause of action"]; *Rope, supra,* 220 Cal.App.4th at p. 656 ["subject of very little litigation"].) *Rope* involved an employee who, when hired, told the employer he planned to donate a kidney to his sister and requested a leave of absence to do so. (*Rope,* at p. 642.) He later requested his leave be extended and paid, pursuant to a newly enacted statute establishing protections for employees who donate organs, and was fired two days before the statute's effective date—purportedly for poor performance, although he had received satisfactory performance reviews. (*Id.* at pp. 642–643.) He sued, and the trial court sustained the employer's demurrer. *Rope* reversed as to several of the

---

[5] Paula relies upon the statement in *Sandell, supra,* 188 Cal.App.4th at page 309, that the *McDonnell Douglas* "burden is reversed" on a summary judgment motion. *Guz* observed that California courts have adopted differing views on how to apply the *McDonnell Douglas* test on an employer's motion for summary judgment. (*Guz, supra,* 24 Cal.4th at pp. 356–357.) "Several California decisions have suggested that because a plaintiff opposing summary judgment need not demonstrate triable issues until the moving defendant has made an initial no-merit 'show[ing],' the *McDonnell Douglas* burdens are 'reversed' on a defense motion for summary judgment against a claim of discrimination in employment. [Citations.] Other California cases, however, have indicated that the plaintiff can survive an employer's motion for summary judgment only by presenting, at the outset, triable evidence satisfying the prima facie elements of *McDonnell Douglas.* [Citations.]" (*Guz,* at pp. 356–357.) The court found it unnecessary to resolve the issue because the employer had produced evidence of nondiscriminatory reasons for terminating the plaintiff's employment that the plaintiff failed to rebut. The same is true here.

11

alleged causes of action, including associational discrimination in violation of FEHA. (*Rope,* at pp. 644, 655–658.)

*Rope* relied upon *Larimer v. International Business Machines Corp.* (7th Cir. 2004) 370 F.3d 698 (*Larimer*), which it described as "the seminal authority on disability-based associational discrimination under the ADA (Americans with Disabilities Act of 1990; 42 U.S.C. § 12101 et seq.)." (*Rope, supra,* 220 Cal.App.4th at p. 656.) "*Larimer* delineated the parameters of a claim of associational discrimination as follows: 'Three types of situation are, we believe, within the intended scope of the rarely litigated . . . association section. We'll call them "expense," "disability by association," and "distraction." They can be illustrated as follows: an employee is fired (or suffers some other adverse personnel action) because (1) ("expense") his spouse has a disability that is costly to the employer because the spouse is covered by the company's health plan; (2a) ("disability by association") the employee's homosexual companion is infected with HIV and the employer fears that the employee may also have become infected, through sexual contact with the companion; (2b) (another example of disability by association) one of the employee's blood relatives has a disabling ailment that has a genetic component and the employee is likely to develop the disability as well (maybe the relative is an identical twin); (3) ("distraction") the employee is somewhat inattentive at work because his spouse or child has a disability that requires his attention, yet not so inattentive that to perform to his employer's satisfaction he would need an accommodation, perhaps by being allowed to work shorter hours.' " (*Rope,* at p. 657, quoting *Larimer,* at p. 700.)

*Rope* considered only the "expense" category, and concluded that although the claim "does not fit neatly within *Larimer's* narrow description of

that category, *Larimer* provided an 'illustrat[ive],' rather than an exhaustive, list of the kind of circumstances which might trigger a claim of associational discrimination." (*Rope, supra,* 220 Cal.App.4th at p. 657.) "Moreover, and more importantly, *Larimer* was decided under the ADA; and the provisions of FEHA are broadly construed and afford employees more protection than the ADA." (*Rope,* at p. 657.) *Rope* reasoned that since the employer fired the employee "on the pretext of poor performance" two days before the effective date of the statute that would have required a paid leave, "[t]he reasonable inference is that Auto-Chlor acted preemptively to avoid an expense stemming from Rope's association with his physically disabled sister." (*Id.* at p. 658.)

In *Castro-Ramirez, supra,* 2 Cal.App.5th 1028, the employee had to administer daily dialysis to his son. After several years of supervisors scheduling the employee's shifts so he could be home at night for the dialysis, a new supervisor changed the schedule and ultimately fired the employee for refusing to work a shift that did not allow him to be home in time. (*Id.* at pp. 1031, 1034.)

*Castro-Ramirez* agreed with *Rope* that FEHA provides additional protections beyond the "floor" established by the ADA, and that the *Larimer* examples of associational disability discrimination were only illustrative. *Castro-Ramirez* explained, "[t]he common thread among the *Larimer* categories is simply that they are instances in which the 'employer has a motive to discriminate against a nondisabled employee who is merely associated with a disabled person.' " (*Castro-Ramirez, supra,* 2 Cal.App.5th at p. 1042, quoting *Larimer, supra*, 370 F.3d at p. 702.) Although the facts of its case did not "fit neatly within one of the *Larimer* categories," the *Castro-Ramirez* court held the evidence supported a reasonable inference that the

13

supervisor engineered a situation that would give him a reason to terminate the employee in order to avoid scheduling needs that were inconvenient for the supervisor:  "In other words, [the employee's] termination for refusal to work the shift was a pretext for [the supervisor's] desire to be rid of someone whose disabled associate made [the supervisor's] job harder."  (*Id.* at p. 1043.)[6]  The employee thus demonstrated a triable issue of fact as to discriminatory motive.  (*Id.* at pp. 1043–1044.)

Drawing on the *Larimer* categories of associational disability discrimination, Paula argues her absences were an "expense" to YapStone, pointing to the emails in which another employee commented to Jezildzic, "[t]he Paula thing is hard but at the same time we have to run a business," and Jezildzic responded, "I knowww and I do feel bad and I get it because it is your sister but dude its been 4 weeks, there is only so much I can do."  Paula argues this exchange shows Paula was being discharged because her absence was interfering with business operations, and a reasonable inference can be drawn that interference with business operations costs a company money.  This is too amorphous a basis for finding a triable issue of fact as to whether

---

[6] As described by the court, the evidence showed that the new supervisor was aware of the employee's need to have shifts that would allow him to administer his son's dialysis and had been asked by the out-going supervisor to work with the employee on this; the new supervisor scheduled a shift he knew to be later than any the employee had had before, despite there being earlier shifts available that he assigned to other employees and a customer on one of those shifts expressly having asked for the employee; the supervisor falsely told the employee that customer was unhappy with him and did not want him making its deliveries; when the employee said he could not work the late shift and asked to return the next day for an assignment, the supervisor laughed and said the previous supervisor was not in charge anymore; and the supervisor fired the employee for this one-time refusal of a shift despite the company policies allowing for less severe disciplinary action. (*Castro-Ramirez, supra,* 2 Cal.App.5th at pp. 1042–1043.)

14

YapStone fired Paula to avoid costs associated with Marcela's disability. As the trial court pointed out, Paula presented no evidence of any direct cost to YapStone resulting from her absence: She was on an unpaid leave at the time of termination, there was no evidence Marcela was covered under Paula's health insurance plan, and no evidence of additional expenditures such as a temporary hire to replace Paula or any lost business opportunity.

Moving beyond the *Larimer* categories, Paula argues that, as in *Castro-Ramirez,* since her employer knew her obligation to a disabled relative was the reason she was refusing to work, a reasonable inference can be drawn that the employer's motivation in discharging her was concern that she would continue to miss work due to her relative's disability. But Paula's situation was quite different from the one she points to in *Castro-Ramirez.* There, the employee refused to work one shift that would have prevented him from attending to his son's dialysis; because the new supervisor refused to schedule the employee for available early shifts as prior supervisors had done, the evidence supported an inference that the supervisor fired the employee to avoid the inconvenience his scheduling needs would cause the supervisor in the future. (*Castro-Ramirez, supra,* 2 Cal.App.5th at pp. 1043–1044.) Here, after YapStone twice extended her leave, Paula simply told her employer she would be away from work "until further notice." The discriminatory motivation inferable from the circumstances in *Castro-Ramirez* are not similarly present here. We agree with the *Rope* and *Castro-Ramirez* courts that *Larimer* did not delineate the exclusive circumstances in which associational disability discrimination can be found, but the circumstances must suggest some motive for the employer to discriminate against the nondisabled employee on the basis of his or her association with a disabled person.

15

As Paula recognizes, an employer is not required to wait indefinitely for an employee's disability to end. (*Hanson v. Lucky Stores, Inc.* (1999) 74 Cal.App.4th 215, 226–227 ["Reasonable accommodation does not require the employer to wait indefinitely for an employee's medical condition to be corrected"]; Cal. Code Regs., tit. 2, § 11068, subd. (c).) In order to prove disability discrimination, "the plaintiff employee bears the burden of proving he or she was able to do the job, with or without reasonable accommodation." (*Green, supra,* 42 Cal.4th at pp. 258, 262.) Paula never suggested to YapStone, and produced no evidence in the trial court, that she could perform the essential functions of her job while in Colombia. She did not request to work remotely and has presented no evidence that the essential functions of her job could be performed remotely, and her argument that "no evidence has been presented that [she] could not perform some of her duties remotely while in Colombia" reverses the burden of demonstrating her ability to perform her job. A leave of absence was the only apparent accommodation that would allow her to continue her employment upon her return. The statement that she would need to be away until further notice was not a request for a *reasonable* accommodation, and upon being informed she could not remain on leave indefinitely, Paula did not request an additional finite period of leave.

Paula argues YapStone should have inferred there was a relatively close end-date for the leave she would require from the update she provided as to Marcela's status—the doctor's note indicating Marcela's period of disability was October 18 to December 18, 2016. But Paula never asked her employer to make this connection. Moreover, given the repeated extensions of Paula's leave due to Marcela not recovering as quickly as had been expected or hoped, the doctor's note did not necessarily provide assurance

16

Marcela would return to work immediately after December 18 (a Sunday) or, inferentially, that Paula would. And, in fact, Marcela did not return to work as the note projected: The sisters did not return to California until mid-January 2017, and Marcela did not return to work before her employment was terminated in March 2017.

Additionally, unlike *Castro-Ramirez,* where past experience showed the employee's scheduling needs could be accommodated without causing problems for the company, here, there is evidence Paula's department was short-staffed. The evidence upon which YapStone relied was Paula's deposition testimony that her team of five fraud detection analysts was overworked even when she worked there, and Jezildzic's declaration that the company quickly hired a replacement for Paula, extending an offer 11 days after Paula's termination to a candidate who began work 10 days later. Paula argues this evidence was insufficient to show her absence caused an undue burden for YapStone. But YapStone's burden was to show a legitimate reason for Paula's termination—a nondiscriminatory reason "that would permit a trier of fact to find, more likely than not, that [it was] the basis for the termination." (*Dinslage v. City and County of San Francisco, supra,* 5 Cal.App.5th at p. 379.) YapStone's evidence was sufficient for this purpose: It is reasonable to infer that an already overworked unit would be significantly affected by a long absence of one of its members.[7]

---

[7] YapStone repeatedly emphasizes that it continued to employ Marcela for several months after it terminated Paula, viewing this as "proof positive" it did not fire Paula because of her association with Marcela. If the company "intended to discriminate against Paula based on her association with Marcela," YapStone maintains, "it would have terminated Marcela at the same time." The point is unconvincing if not disingenuous. YapStone could not have fired Marcela at the time it fired Paula: At a minimum, the record

It then became Paula's burden to " 'offer substantial evidence that the employer's stated nondiscriminatory reason for the adverse action was untrue or pretextual, or evidence the employer acted with a discriminatory animus, or a combination of the two, such that a reasonable trier of fact could conclude the employer engaged in intentional discrimination." (*Horn v. Cushman & Wakefield Western, Inc.* (1999) 72 Cal.App.4th 798, 806–807, quoting *Hersant v. Department of Social Services* (1997) 57 Cal.App.4th 997, 1004–1005.) To meet this burden, an employee cannot "simply show the employer's decision was wrong, mistaken, or unwise" but rather " ' "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find them 'unworthy of credence,' [citation], and hence infer 'that the employer did not act for the [. . . asserted] non-discriminatory reasons.' [Citations.]" [Citations.]' " (*Horn,* at p. 807, quoting *Hersant,* at p. 1005.) Paula did not do so.

Paula argues it could reasonably be inferred that YapStone fired her because she was upset with Jezildzic for being unwilling to accommodate her need to care for Marcela. The basis for this argument is a November 23, 2016 redacted electronic conversation in which Jezildzic said to another employee, "then i got yelled at by paula and told im not human and have no empathy . . . which is annoying."

Paula offers two cases to support this argument. In *Kelleher v. Fred A. Cook, Inc.* (2d Cir. 2019) 939 F.3d 465, an ADA case, an employee whose

reflects that Marcela was protected by the FMLA until January 9, 2017. And YapStone's decisions regarding Marcela's employment had to be made with consideration of her right to reasonable accommodation of her disability under FEHA.

young daughter had a severe neurological disorder was told he could not leave work immediately after his shifts, his request to work shortened shifts (eight hours rather than 10 to 12 hours) for one week was denied, and he was told his problems at home were not the company's problems. (*Kelleher*, at pp. 466–467.) When he missed a day of work after his daughter suffered a near-fatal seizure, he was demoted, another request for shortened shifts (to enable him to visit his daughter in the hospital) was denied, and he was terminated upon arriving to work 10 to 15 minutes late one day. (*Id.* at p. 467.) In reversing the trial court's dismissal of the complaint, *Kelleher* stated, "[t]hough the ADA does not require an employer to *provide* a reasonable accommodation to the nondisabled associate of a disabled person, an employer's *reaction* to such a request for accommodation can support an inference that a subsequent adverse employment action was motivated by associational discrimination. Thus, in this case, [the employer's] demand that Kelleher 'leave his personal problems at home' after Kelleher requested one week of shortened workdays supports Kelleher's claim that his later termination was motivated by associational discrimination." (*Id.* at p. 469.)

The comment Paula points to was not a response to Paula's request for an accommodation; it was a response to Paula's expression of anger at being denied further leave. Additionally, in *Kelleher*, the employer's dismissive comment about problems at home was in response to the employee's initial request for accommodations. Here, it appears Jezildzic's comment about Paula yelling at her was made on the day Paula spoke by telephone with Jezildzic after receiving the letter informing Paula of the requirement that she return to work by November 28. YapStone had already extended Paula's leave twice, and the letter was responding to Paula's statement that she would not be returning until further notice.

19

Even more important than these factual differences, *Kelleher* was reviewing the dismissal of a complaint: The issue was whether the plaintiff pleaded a claim for associational discrimination, not, as here, whether he raised a triable issue of fact. (*Kelleher, supra,* 939 F.3d at p. 470.) Distinguishing the case upon which the defendant and district court had relied, the *Kelleher* court stated, "More fundamentally, *Graziadio* [*v. Culinary Inst. of Am.* (2d Cir. 2016) 817 F.3d 415] was decided on summary judgment. On a motion to dismiss, we do not consider potential nondiscriminatory reasons for termination; we examine the complaint to determine whether it contains 'at least minimal support for the proposition that the employer was motivated by discriminatory intent.' *Littlejohn* [*v. City of New York* (2d Cir. 2015)] 795 F.3d [297,] 311. Whether such motivation was 'the true reason (or in any event not the sole reason) for the employment decision' is a question that cannot be resolved on these pleadings alone. [Citation.]"

Paula also points to *Fenn v. Mansfield Bank* (D.Mass. 2015) 2015 U.S.Dist. LEXIS 17235, in which an employee whose wife was disabled was directed by the employer to attend a week-long training session in another city. Because of his need to care for his wife, the employee asked to take the training in a closer location or online; these requests were denied and he was terminated. In the ensuing lawsuit, the employer moved to dismiss a claim for associational discrimination on the ground that it was based on the employee being fired for demanding a work accommodation to which he was not entitled. Denying the motion, the district court explained that the complaint alleged not only that the employee requested an accommodation the employer was unwilling to give, but also that the employee's wife's disability "was a determining factor in [the employer's] abrupt decision to terminate him and that [the employer] harbored animosity against him even

for asking for the accommodation." (*Id.* at p. 8.) "Such allegations, which the Court is obligated to assume as true at this stage of the litigation, sufficiently assert that [the employer's] decision to terminate him was 'premised on hostility toward the handicapped condition of [his] spouse' and, thus, was 'because of his association with his handicapped wife.' " (*Ibid.*) The court noted that its decision was based "solely on the face of the amended complaint." (*Ibid.*)

Here, the question is whether Paula presented evidence raising a triable issue of fact as to whether YapStone's asserted reason for firing her— her refusal to return to work by November 28—was pretextual and the termination actually motivated by hostility toward Paula due to her association with Marcela's disability. Jezildzic's comment that Paula yelled at her and told her she was "not human" and had "no empathy," apparently after Paula was told she had to return to work by November 28, was insufficient to support a reasonable inference that Paula was fired because YapStone was hostile toward Paula for asking for leaves of absence or Jezildzic was tired of the "nuisance of communicating" with Paula in Colombia, as Paula suggests.

In sum, Paula failed to submit evidence raising a triable issue of fact as to whether her association with a disabled person was a substantial motivating factor in the termination of her employment.[8]

---

[8] YapStone asks us not to follow *Rope* and *Castro-Ramirez*, but rather to adopt the reasoning of the dissent in *Castro-Ramirez,* which concluded that a claim of associational disability discrimination under FEHA should be analyzed consistently with such a claim under the ADA. The fundamental disagreement between the majority and dissent in *Castro-Ramirez* concerned whether FEHA requires an employer to provide reasonable accommodations to an employee who is only associated with a disabled person. The question

21

## II.

Section 12940, subdivision (n), makes it unlawful for an employer to "fail to engage in a timely, good faith, interactive process with the employee . . . to determine effective reasonable accommodations, if any, in response to a request for reasonable accommodation by an employee . . . with a known physical or mental disability or known medical condition."  Although she did not allege a cause of action for denial of a reasonable accommodation, Paula did allege a claim for failure to engage in good faith in the interactive process to determine a reasonable accommodation.

YapStone argues we should not recognize a cause of action for failure to engage in the interactive process under section 12940, subdivision (n), for a person who is merely associated with a disabled person, urging us to follow ADA caselaw holding there is no duty to provide reasonable accommodations to an employee who is not himself or herself disabled.  (42 U.S.C.

---

turns on differences in statutory language between FEHA and the ADA, which does *not* require such accommodation.  (42 U.S.C. § 12112(b)(5)(A); *Larimer, supra,* 370 F.3d at p. 700; see fn. 9, *post*.)  The *Castro-Ramirez* majority observed that FEHA could reasonably be read as requiring reasonable accommodation based on association with a disabled person, but stated it was not deciding the issue because the plaintiff had abandoned his claim for denial of reasonable accommodations.  (*Ibid.*)  The dissent viewed the majority as having "in effect" decided accommodation is required, reasoning that refusing a schedule change in order to allow an employee to care for a disabled relative could be seen as evidence of disability discrimination only if there is a duty to provide the accommodation.  (*Castro-Ramirez, supra,* 2 Cal.App.5th at pp. 1052, 1059–1060, 1062.)

The present case does not require us to decide the issue, because Paula did not allege a claim for denial of a reasonable accommodation and, as we have explained, the accommodation she sought was *not* reasonable.  But we have no disagreement with the *Castro-Ramirez* majority that analysis of a claim for associational disability discrimination under FEHA must take into consideration any relevant differences between FEHA and the ADA.

22

§ 12112(b)(5)(A); *Larimer, supra,* 370 F.3d at p. 700.) Paula relies upon dicta in *Castro-Ramirez* stating that because section 12926, subdivision (o), makes association with a disabled person a part of "physical disability," the requirement that an employer accommodate an employee's physical disability (§ 12940, subd. (m)) "may reasonably be interpreted to require accommodation based on the employee's association with a physically disabled person." (*Castro-Ramirez, supra,* 2 Cal.App.5th at p. 1039.)[9] We

---

[9] The text of the ADA makes clear that it does not require an employer to accommodate an employee on the basis of his or her association with a disabled person. The ADA protects against associational disability discrimination by defining the prohibited " 'discriminat[ion] against a qualified individual on the basis of disability. . . .' (42 U.S.C. § 12112(a)" as including " 'discriminat[ion] against a qualified individual . . . because of the known disability of an individual with whom the qualified individual is known to have a relationship or association.' (42 U.S.C. § 12112(b)(4).)" (*Castro-Ramirez, supra,* 2 Cal.App.5th at p. 1040.) But with regard to accommodation, the ADA provides that " ' "discriminat[ion] against a qualified individual on the basis of disability" ' includes " 'not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual *with a disability who is an applicant or employee.*' (42 U.S.C. § 12112(b)(5)(A), italics added.)" (*Castro-Ramirez,* at p. 1040.) This language cannot be read to require reasonable accommodation for an employee who is not personally disabled.

By contrast, since FEHA includes association with the disabled in its definition of disability (§ 12926, subd. (o)), FEHA's requirement for employers to make reasonable accommodation for the "known physical or mental disability of an applicant or employee" (§ 12940, subd. (m)(1)) "may reasonably be interpreted to require accommodation based on the employee's association with a physically disabled person." (*Castro-Ramirez, supra,* 2 Cal.App.5th at pp. 1038–1039.)

To our knowledge, and according to the parties, no published California case has directly decided this issue. The federal district court in *Castro v. Classy, Inc.* (S.D.Cal. Mar. 2, 2020) 2020 WL 996948, however, in denying an employer's motion to dismiss, accepted the argument that accommodation on the basis of association with a disabled person is required because

23

find it unnecessary to resolve the question because even if we assume YapStone was required to provide reasonable accommodations on this basis, Paula failed to raise a triable issue of fact as to whether YapStone engaged in good faith in the interactive process.

The purpose of the interactive process is to identify an accommodation that allows the employee to perform his or her job effectively. (*Scotch v. Art Institute of California* (2009) 173 Cal.App.4th 986, 1013 (*Scotch*); *Nadaf-Rahrov v. Neiman Marcus Group, Inc.* (2008) 166 Cal.App.4th 952, 984.) "Both employer and employee have the obligation 'to keep communications open' and neither has 'a right to obstruct the process.' [Citation.] 'Each party must participate in good faith, undertake reasonable efforts to communicate its concerns, and make available to the other information[,] which is available, or more accessible, to one party. Liability hinges on the objective circumstances surrounding the parties' breakdown in communication, and responsibility for the breakdown lies with the party who fails to participate in good faith.' [Citation]." (*Scotch,* at pp. 1013–1014.)

Here, YapStone responded to Paula's need to care for Marcela by agreeing to her initial leave and extending it twice at her request before imposing a deadline for Paula's return to work after she stated she would be gone until further notice. We assume Paula's claim of failure to engage in the interactive process in good faith is directed at this imposition of a deadline, as YapStone cannot be seen as failing to engage in good faith during the period it was approving her leave extensions. The deadline—imposed, as we have said, together with another extension of the leave—was YapStone's response

___

subdivisions (m) and (n) of section 12926—requiring reasonable accommodation and engagement in the interactive process to determine reasonable accommodations—"are subject to the same broad definition of physical disability encompassed in" section 12926, subdivision (o).

to Paula's statement that she would not return to work until further notice; YapStone's letter explained that its business needs would not permit Paula to remain on leave beyond the date stated. Paula protested YapStone's statement that she would be viewed as having voluntarily abandoned her job if she did not return by November 28, 2016, but she did not request a further leave of specific duration or any other accommodation. "To prevail on a claim under section 12940, subdivision (n), for failure to engage in the interactive process, an employee must identify a reasonable accommodation that would have been available at the time the interactive process should have occurred." (*Scotch, supra,* 173 Cal.App.4th at pp. 1018–1019; *Nadaf-Rahrov v. Neiman Marcus Group, Inc., supra*, 166 Cal.App.4th at p. 984.) Paula's assertion that she needed to remain away from work indefinitely, if construed as a request for accommodation, was *not* a request for a *reasonable* accommodation. She did not submit evidence to refute the legitimacy of YapStone's need for her to return by November 28, 2016, or demonstrate the company could have permitted a lengthier leave without undue hardship. Paula has not demonstrated a triable issue as to this cause of action.

### III.

The trial court concluded that Paula's causes of action for wrongful termination and failure to take all reasonable steps necessary to prevent discrimination necessarily failed because the underlying cause of action for associational disability discrimination did not survive summary adjudication. Paula makes no argument regarding these causes of action except to note the *Rope* and *Castro-Ramirez* courts' conclusions that causes of action for wrongful termination and failure to prevent discrimination survived where claims for associational disability discrimination survived. Our determination that summary adjudication was proper as to Paula's

associational disability claim necessarily means it was proper as to the wrongful termination and failure to prevent discrimination causes of action as well.

## DISPOSITION

The judgment is affirmed.

Costs to YapStone.

_____
Kline, P.J.

We concur:


_____
Richman, J.


_____
Miller, J.


*Vega et al. v. YapStone, Inc.* (A160884)